UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| EDGAR J. PRANGE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-0281-LJM-WTL |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff, Edgar J. Prange ("Prange"), requests judicial review of the final decision of defendant, Michael J. Astrue, Commissioner of Social Security (the "Commissioner"), denying Prange's application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act ("SSA"). The Court rules as follows.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

Prange was born on December 26, 1951. R. at 718. Prange was fifty-three years old at the time of Administrative Law Judge James R. Norris's (the "ALJ") decision R. at 26, 718. Prange has a high school education and has worked as a circuit board assembler and warehouse foreman. R. at 311, 331.

Prange applied for DIB and SSI payments on March 26, 2001, alleging that his disability began earlier that month when he had a pacemaker and defibrillator implanted. R. at 718-20.

Prange's application was denied, as was his application for rehearing.  R. at 723, 726-30.  Prange requested a hearing before an ALJ.  R. at 55.  Two hearings were held in February 2004 and March 2005, at which Prange was represented by counsel.  R. at 760-856.  The ALJ entered a decision on June 24, 2005, that Prange was not disabled under the SSA.  R. at 12-26.  The ALJ found that Prange was not disabled within the meaning of the SSA for any time period relevant to the decision.  R. at 12.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review.  R. at 3-5.

## B.  MEDICAL HISTORY

Prange was admitted to Hancock Memorial Hospital on March 3, 2001, after experiencing shortness of breath, swelling in his ankles, and chest pain.  R. at 645.  Prange was found to have congestive heart failure ("CHF"),[1] nonischemic dilated cardiomyopathy,[2] and global hypokinesis.[3] R. at 645, 669.  Prange was transferred to St. Vincent's Hospital, where he had a pacemaker and defibrillator implanted.   R. at 705.  Prange was discharged on March 13, 2001, and was told he should quit smoking and that he should not to return to work until after a follow up visit in two months.  R. at 710.

---

[1]"Congestive Heart Failure" is the "inability of the heart to pump enough oxygenated blood to body tissues."  20 C.F.R. Pt. 404, Subpt. P, App. 1.

[2]"Dilated Cardiomyopathy" is "decreased function of the left ventricle associated with its dilation."  Steadman's Med. Dictionary, 282 (26th ed. 2005) (hereinafter "STEDMAN'S").  "Non-ischemic" means that the cardiomyopathy was not caused by blockage of blood vessels.  R. at 821.

[3]"Global Hypokinesis" is widespread diminished wall movement in the heart. STEDMAN'S, at 836.  *See also* R. at 843.

2

Prange was admitted to the emergency room on March 21, 2001, after his defibrillator discharged.  R. at 696.  Prange's defibrillator suggested the discharge was caused by recurrent atrial fibrillation.[4]  R. at 697.  Prange was given Amiodarone to treat the fibrillation and was released four days later after showing no more symptoms.  R. at 698, 700.

On March 5, 2002, Prange was admitted to the emergency room again after his defibrillator discharged seven times in ten minutes.  R. at 350, 393.  The discharge was caused by a lead fracture, and his rhythm was normal.  R. at 360, 363.  The defective lead was replaced.  R. at 363.

Prange was admitted to the emergency room again on March 25, 2002.  R. at 406.    The previously replaced lead had become dislodged.  *Id.*  The dislodged lead was replaced and Prange was released after observation to ensure there was no more lead movement.  R. at 405.

Following the second defibrillator discharge, Prange began experiencing anxiety about the defibrillator discharging again.  R. at 807-11.  Prange returned to the Hancock Memorial Hospital in April 2002 complaining of anxiety and that he felt a "squeezing feeling" in his chest.  R. at 80. Prange was prescribed Ativan for his anxiety and was discharged.  R. at 86.  Dr. Nancy A. Branyas ("Dr. Branyas"), Prange's cardiologist, prescribed Xanax for his anxiety in May 2002.  R. at 141. Prange again complained of anxiety relating to that episode at a follow up exam with Dr. Thomas Fallinger ("Dr. Fallinger") in February 2003, and Dr. Fallinger stated that Prange appeared very anxious during the exam.  R. at 130.

In August 2003, Prange's ejection refraction was estimated at 35%-40% during a follow up exam.  R. at 256.

---

[4]"Atrial fibrillation" is a condition "in which the normal rhythmical contractions of the cardiac atria are replaced by rapid irregular twitchings of the muscular wall; the ventricles respond irregularly to the dysrhythmic bombardment from the atria."  STEADMAN'S, at 646.

On April 4, 2004, Prange complained of extreme fatigue.  R. at 229.  Prange performed an exercise stress echocardiogram, which was stopped due to fatigue.  R. at 232.  Prange also complained of chest pain during the test.  *Id*.  At that time, Prange had an ejection refraction estimated at 40%-50%.  R. at 11.  On April 26, 2004, Prange underwent a cardiac catheterization and had an estimated ejection refraction at 30%.  R. at 227.  Prange was discharged with instructions to quit smoking and refrain from lifting more than twenty pounds for two days.  R. at 235.  Prange was also told he could return to work in one to two days.  *Id*.

## C.  ALJ HEARING

Prange's initial hearing was held on February 12, 2004.  R. at 804-56.  Prange testified that he has been unable to perform his past work as a circuit board assembler since March 2001 due to his heart condition and anxiety resulting from the shocks he received when his defibrillator malfunctioned.  R. at 807-12 .  Prange also testified that he looked for work during the first year after his pacemaker and defibrillator were implanted, but that he was not able to find any work.  R. at 811-12.  Prange stated that his cardiologist recommended that he not work following the defibrillator malfunction.  *Id*.  Prange stated that he stays in his bedroom most days and listens to the radio and organizes his baseball card collection.  R. at 812-13.  Prange also testified that he walked a lot during the first year after his defibrillator was implanted, but he does not do so any more because he gets fatigued and fears that his defibrillator will shock him again.  R. at 815-16.  Prange stated that he naps for one or two hours every day.  R. at 816.  Prange testified that he stood for eight to sixteen hours a day at his previous jobs.  R. at 817.

Michael Blankenship, a vocational expert (the "VE"), also testified at the hearing.  R. at 819.
The VE testified that he believed Prange's work as a circuit board assembler was light and semi-skilled.[5]  R. at 820, 766.  The VE testified that the circuit board assembly job would have
transferrable skills if it were semi-skilled, but would not if it were unskilled.  R. at 845-46.  The VE
stated that if the circuit board assembly job was classified as semi-skilled,  there were 851 jobs in
Indiana that were sedentary or light and had a skill level equal to the circuit board assembly job.  R.
at 845.  The VE testified that Prange's former work as a warehouse foreman was light and semi-skilled.  R. at 820.

A medical expert, Dr. Morton Tavel (the "ME"), also testified at the hearing.  The ME
testified that Prange has nonischemic cardiomyopathy.  R. at 821.  The ME testified that Prange had
a pacemaker and defibrillator implanted.  R. at 822-23.  The ME then testified that there was not
sufficient evidence to meet the requirements for Listing 4.05.  R. at 825.  The ME stated that Prange
did not meet the requirements for that Listing, which requires that the claimant have recurrent
arrhythmia with syncope or near syncope,[6] because there was no indication that he had experienced
syncope or near syncope.  R. at 825-26.

The ME then testified that he did not believe Prange met the requirements for Listing 4.02.
R. at 826.  The ME testified that 4.02 requires that the claimant have an ejection refraction below

---

[5]The February 12 hearing was adjourned in part to allow the VE to acquire a job
description from Prange's former employer to determine whether the circuit board assembly
position as performed by Prange was semi-skilled or unskilled.  R. at 852.  Prange obtained a
deposition from a former co-worker, from which the VE determined that the work was unskilled.
R. at 237-46, 820.

[6]"Syncope" means "loss of consciousness and postural tone caused by diminished
cerebral blood flow."  STEADMAN'S, at 1720.

30% with additional symptoms. *Id*. The ME testified that there was data that Prange had an ejection refraction as low as 15% in March 2001, but that subsequent tests suggested that his condition had improved. *Id*. The ME stated that a catheterization was performed in February of 2002, but that ejection refraction was not calculated. *Id*. The ME testified that he estimated Prange's fractional shortening at that time was 23%, which was in the normal range, which showed improvement in heart function. R. at 826-27. The ME then testified that listing 4.02 also requires other symptoms, such as pain or limitation in physical activity. R. at 827, 830. The ME testified that he could make a better determination of whether Prange met the requirements for 4.02 if a treadmill test was performed to test Prange's functional capacity. R. at 842. The ME opined that he could not say whether or not Prange would be limited to sedentary work at this time. R. at 844. The hearing was adjourned to allow Prange to perform the treadmill test.[7] R. at 852.

The second hearing was held on March 25, 2005. R. at 760-803. The ME testified that Prange performed a treadmill test, and that he performed at a level of 10.1 METS and achieved a heart rate at 76% of the maximum heart rate, but the test had to be stopped before Prange reached his target heart rate of 85% of the maximum heart rate. R. at 769, 775. Prange had to stop the test due to fatigue and chest discomfort. R. at 777. The ME thought that the fatigue and chest discomfort were due to the medication that Prange was taking. R. at 775-76. The ME also testified that a heart catheterization was performed, and Prange's ejection infraction was estimated at 30%, but that he was unsure whether the estimate was accurate. R. at 778.

_____

[7]The treadmill test, also known as an exercise stress echocardiogram, was performed on April 6, 2004. R. at 229.

The ME stated that from the treadmill test, he could extrapolate that Prange would be capable of walking for up to six hours a day, and that he could lift ten pounds frequently and twenty pounds occasionally.  R. at 769-770.  The ME also stated that he believed that Prange could work four to eight hours a day.  R. at 779-80.  The ME testified that Prange's anxiety might raise the risk of congestive heart failure if he is active, but, even with the anxiety, light work would not be too great a risk.  R. at 795, 797.  The ME testified that, with one exception, none of Prange's medication had fatigue as a common side effect.  R. at 802.  The ME stated that the one medication that had fatigue as a side effect, Toprol, did not cause fatigue very often.  *Id*.

The VE testified again at the second hearing.  R. at 765-67, 797-801.  The VE testified that, based on reading the affidavit by Prange's former co-worker who trained him, that Prange's circuit board assembly job as Prange performed it  would be classified as light unskilled work.  R. at 766, 798.

Dr. Branyas did not testify, but she did write a letter and give a statement to Prange's attorney.  R. at 60, 189-92.  Dr. Branyas stated that Prange's condition put him at "risk for sudden cardiac death . . . and recurrent episodes of congestive heart failure."  R. at 60.  Dr. Branyas also stated that there was "no question that Mr. Prange qualifies for permanent disability predominantly on basis [sic] of his cardiomyopathy, his history of ventricular tachycardia, and ICD implantations." *Id*.  Dr. Branyas wrote that Prange's heart had abnormal wall function, which places him at risk for congestive heart failure.  R. at 60.  In a conversation with Prange's attorney, Dr. Branyas stated that Prange's symptoms are as serious as those described in Listing 4.02.  R. at 190.  Dr. Branyas testified that the treadmill test was unnecessary because it is usually used as a screening test to determine whether to perform a cardiac catheterization, which had already been performed.  R. at 190-91.  Dr.

Branyas reported that Prange had the defibrillator implanted because he had experienced multiple runs of ventricular tachycardia at rest. R. at 191. Dr. Branyas also stated that the defibrillator would not prevent additional abnormal rhythms, but would shock him back to normal rhythm. *Id.* She commented that Prange was prescribed Amiodarone to control his heart rhythm, and that it had worked well. *Id.* Dr. Branyas opined that Prange's symptoms were as serious as those in Listing 4.05. R. at 192. Dr. Branyas stated that Prange was at risk for recurrent arrhythmias, and had suffered recurrent arrhythmias, which caused his defibrillator to discharge. *Id.* Dr. Branyas concluded that she did not think Prange could perform light work, but that he could perform sedentary work for a couple of hours a couple of days a week. *Id.* Dr. Branyas also opined that Prange's condition had improved, but his condition could worsen with little warning. *Id.*

## II. <u>DISABILITY AND STANDARD OF REVIEW</u>

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ applies the five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1.   If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2.   If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3.  If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4.  If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5.  If the claimant can perform other work given the claimant's residual functional capacity, age, education

The burden of proof is on the claimant for the first four steps, then shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become the findings of the Commissioner. *See, e.g., Henderson v. Apfel*, 179 F.3D 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala,* 999 F.2d 635, 643 (7th Cir. 1987). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path

9

of his reasoning." *Diaz*, 55 F.3d at 307.  An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

### III.  DISCUSSION

### A.  THE ALJ'S FINDINGS

At the first step of the disability analysis, the ALJ found that Prange had not performed substantial gainful activity since March 3, 2001.  R. at 25.  At the second step, the ALJ found that Prange had severe medical impairments of cardiomyopathy, ventricular tachycardia, back impairment, impairments of the shoulders and knees, and anxiety related to concern over his physical condition.  *Id.*  The ALJ found that Prange's anxiety was not a severe impairment when considered individually.  R. at 15.  At step three, the ALJ found that Prange did not meet or equal any impairment in the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.*  At step four, the ALJ found that Prange was only a partially credible witness and had the following RFC:

> [Prange] has the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently, to perform work that requires a great deal of walking or standing, and to perform work that requires mostly sitting and pushing or pulling of arm or leg controls. [Prange] must avoid work at dangerous heights, working in close proximity to dangerous machinery, and operating motorized vehicles.  Thus, [Prange] has the ability to do "light" work and the ability to do "sedentary" work, which is defined as requiring him to sit for at least six hours of an eight hour work day, to walk and stand for no more than two hours during an eight hour work day, and to lift no more than ten pounds at a time.

R. at 26.  Based on this RFC and testimony from the VE, the ALJ found that Prange could perform his past work as a circuit board assembler as he actually performed it and as it is generally performed in the economy, and that he is also able to perform his past work as a warehouse foreman as it is

10

generally performed in the economy.  *Id*.  Therefore, the ALJ found that Prange was not disabled. *Id*.

Prange argues that the ALJ erred in finding that he was not disabled on the following grounds: (1) Prange met or equaled the requirements for Listing 4.02; (2) Prange met or equaled the requirements for Listing 4.05; (3) the ALJ disregarded Dr. Branyas's findings that he met or equaled Listings 4.02 and 4.05 and credited the testimony of the ME; (4) that if his cardiac condition were not a listing-level impairment, the combination of his anxiety and cardiac impairments rendered him disabled; and (5) the VE should have been asked a hypothetical question that indicated a 50% weakened heart capability or anxiety.

## B.  THE ALJ'S FINDINGS ON LISTING 4.02

Prange alleges that the ALJ erred in finding that he did not meet or equal the requirements of Listing 4.02B.  Prange alleges that the ALJ only considered "whether the implantation of a pacemaker was disabling and not the fact that Prange's left ventricle was weakened to the point that it met" the requirements of Listing 4.02.  There is no evidence in the record supporting Prange's claim that he met the requirements for Listing 4.02.  Listing 4.02 can be met by showing

> B. . . . left ventricular ejection fraction of [thirty] percent or less by appropriate techniques; and

> 1. Inability to perform on an exercise test at a workload equivalent to [five] METs or less due to symptoms of chronic heart failure, or, in rare instances, a need to stop exercise testing at less than this level of work because of:

> a. Three or more consecutive ventricular premature beats or three or more multiform beats; or . . .

* * *

11

       c. Signs attributable to inadequate cerebral profusion, such as ataxic gait or mental confusion, and

       2. Resulting in marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though the individual is comfortable at rest.

20 C.F.R. Pt. 404, Subpt. P, App.1.  There is evidence in the record that Prange has had a left ventricular ejection fraction of 30% or less, including that measured during a cardiac catheterization performed in April 2004.  R. at 227.  However, there is no evidence in the record that Prange has met any of the additional requirements for this Listing.  In fact, there is evidence in the record that Prange did not meet those requirements.  For example, Prange was able to perform the treadmill test at least to 10.1 METS.  R. at 777.

Although the ALJ did not provide a thorough analysis of Listing 4.02, he did note that Prange was unable to demonstrate any of the requirements other than ejection fraction of 30% or less.  R. at 21.  The Court will not remand on grounds that have no support in the record.  *See Scott v. Barnhart*, 297 F.3d 589, 595 ("We have consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case." (quoting *Seene v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999)).

Prange also argues that if he does not meet the requirements of Listing 4.02, his condition equaled that Listing.  Prange relies on Dr. Branyas's opinion for this conclusion.  Specifically, Dr. Branyas wrote that Prange's condition was as severe as that Listing: "He is at risk for sudden cardiac death and has an enlarged heart, which poses a risk for him for recurrent episodes of congestive heart failure.  His ejection fraction has been as low as 20% and it has shown some mild improvement in

the recent past." R. at 60. Prange alleges that the ALJ erred by completely disregarding Dr. Branyas's opinion that his condition equaled Listing 4.02.

A claimant's condition is equivalent to a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). Equivalence is determined by the ALJ when the case is decided in a disability hearing. 20 C.F.R. § 404.1526(e). The ALJ "consider[s] all evidence in [the] record about [the] impairment(s) and its effects on [the claimant] that is relevant to [the] finding." 20 C.F.R. § 404.1526(c). Therefore, the ALJ was required to consider Dr. Branyas's opinion; however, in determining whether a claimant's condition equals a Listing impairment, a treating physician's opinion is not given controlling weight. 20 C.F.R. § 404.1527(e)(2). Rather, the treating physician's opinion is given weight according to the following factors: (1) whether the physician has examined the claimant; (2) whether the physician has treated the claimant; (3) the length and frequency of examination; (4) the nature and extent of the treatment relationship; (5) the amount of relevant evidence the physician presents to support her opinion; (6) whether the source's opinion is consistent with the record as a whole; (7) whether the source is offering opinions based on her area of specialty; and (8) other relevant factors. 20 C.F.R. § 404.1527(d)(1)-(6).

First, the ALJ did not err when he accorded Dr. Branyas's opinion little weight. Although the ALJ did not consider all the listed factors when weighing Dr. Branyas's conclusion, he did focus on the substantial evidence in the record that contradicts Dr. Branyas's opinion. R. at 21. Specifically, the ALJ noted that Dr. Branyas had conceded that Prange's ejection fraction had improved since it had been measured at 20%. *Id.* In fact, with the exception of the measurement during the April 16, 2004, cardiac catheterization, Prange's ejection fraction was measured above

13

30% every time it was tested since April 2003. R. at 11, 256. Even when Prange's ejection fraction was estimated at 30% in April 2004, the cardiologist who performed the cardiac catheterization, Dr. Fallinger, stated that Prange would be able to work again in 1-2 days. R. at 235. Furthermore, the ALJ noted that Prange had not been readmitted for congestive heart failure after March 2001. R. at 21. The ALJ also found the ME's interpretation of the evidence more convincing. *Id*. Clearly the ALJ's decision to accord Dr. Branyas's opinion is supported by substantial evidence in the record.

Second, the ALJ's determination that Prange's impairments did not equal Listing 4.02 is also supported by substantial evidence. As previously outlined, an ALJ does not need to give the treating physician's opinion controlling weight when he determines whether a claimant's impairments equals a Listing. 20 C.F.R. § 404.1527(e)(2). Here the ALJ's decision provided sufficient reason why he gave more weight to the ME than to Dr. Branyas. *See Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (noting that the "ALJ must 'sufficiently articulate his assessment of the evidence to assure us that [he] considered the important evidence...[and to enable] us to trace the path of [his] reasoning.'") (quoting *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996)). The ALJ's reasoning and explanations in this case "'build an accurate and logical bridge between the evidence and the result.'" *Id.* (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). As such, this Court concludes that the ALJ's decision that Prange's impairments did not equal Listing 4.02 was proper.

### C. THE ALJ'S FINDING ON LISTING 4.05

Prange also alleges that the ALJ erred in finding that he did not meet or equal Listing 4.05. Listing 4.05 can be met by showing:

> Recurrent arrhythmias, not related to reversible causes, . . . resulting in uncontrolled
> . . ., recurrent . . . episodes of cardiac syncope or near syncope . . . despite prescribed
> treatment . . ., and documented by resting or ambulatory (Holter) electrocardiography,
> or by other appropriate medically acceptable testing, coincident with the occurrence
> of syncope or near syncope.

20 C.F.R. Pt. 404, Subpt. P, App.1.  There is no evidence in the record that Prange suffered syncope or near syncope, therefore, the ALJ in finding that Prange failed to meet the requirements for Listing 4.05 is supported by substantial evidence.

Prange also alleges that the ALJ erred in rejecting Dr. Branyas's opinion that Prange's condition equaled Listing 4.05.  As noted above, a treating physician's opinion that a claimant equals a listed condition is not given controlling weight, but it must be considered.  20 C.F.R. § 404.1526. The ALJ found that Dr. Branyas's conclusion had little support in the record and was inconsistent with other evidence in the record, thus he accorded Dr. Branyas's opinion little weight.  R. at 21. This decision is supported by substantial evidence in the record.

Dr. Branyas stated that Prange had "multiple runs of ventricular tachycardia and premature beats even when he was at rest[,]" which "posed a substantial risk of cardiac arrest and death because of the irregular heart rhythm in a markedly enlarged heart."  R. at 16.  The ALJ noted that Dr. Branyas also admitted that "his irregular rhythms could occur at any time without any relationship to his activity; that his defibrillator didn't prevent the rhythm, but would shock him back into a normal rhythm; and that he had done well since a drug, Amiodarone, had been added to help him control his heart rhythm."  *Id*. (citations omitted).  The ALJ noted that Dr. Branyas's opinion that Prange's condition equaled Listing 4.05 because he was at risk for recurrent arrhythmias, was not wholly consistent with the record, which showed that Prange's condition was not life-threatening

because his defibrillator would protect him, and that his cardiac function had improved since 2001. *Id*.

The ALJ also consider the ME's opinion about Prange's condition when he determined to accord Dr. Branyas's opinion little weight with respect to Listing 4.05. R. at 22. The ALJ noted that the ME was an expert in the area, and that his conclusions were supported by the evidence. *Id*. The ME testified that the treadmill test confirmed the absence of congestive heart failure, and that the defibrillator was intended to prevent sudden cardiac death from arrhythmia. *Id*. Based on all the evidence, the ALJ agreed with the ME that Prange's impairments did not equal those in Listing 4.05.

The ALJ's determination that Prange did not meet or equal Listing 4.05 is supported by substantial evidence. For the reasons set out above, the ALJ's treatment of Dr. Branyas's opinion and the inconsistent evidence in the record "'build[s] an accurate and logical bridge between the evidence and the result.'" *Hickman*, 187 F.3d at 689 (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)). Therefore, this Court finds that the ALJ's decision with respect to whether Prange's impairments met or equaled those Listing 4.05 is supported by substantial evidence.

### D. THE ALJ'S FINDING ON PRANGE'S ANXIETY

Prange also alleges that the ALJ erred in not considering whether Prange's anxiety in conjunction with his heart condition met or equaled a listed condition. Prange contends that in combination his impairments render him unemployable. This allegation finds no support in the record.

The ALJ did not consider whether the anxiety and the heart condition together rendered Prange disabled, but the ALJ did consider whether Prange's anxiety met a Listing. Although the ALJ

did not refer to the Listing by name, the ALJ clearly determined that Prange failed to meet the requirements of Listing 12.06.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  It would have been helpful if the ALJ had discussed the Listing after naming it, *see Barnett v Barnhart,* 381 F.3d 664, 668 (7th Cir. 2004) ("In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing."), however, it was relatively easy for the Court to determine the subject of the ALJ's opinion because he quoted Listing 12.06 several times in his discussion of Prange's anxiety.

As discussed by the ALJ, there is no evidence in the record to suggest that Prange's anxiety meets the requirements of Listing 12.06.  A claimant can meet the requirements of Listing 12.06 by satisfying either A and B or A and C:

A. 1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a. motor tension; or

b. Autonomic hyperactivity; or

c. Apprehensive expectation; or

d. Vigilance and scanning; or

2. A persistent irrational fear of a specified object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

17

AND

    B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration.

OR

    C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, App. 1.  The ALJ appeared to either find or assume that Prange met the requirements for A.2., but found that he did not meet the requirements for either B. or C.

The ALJ noted that Prange testified that he did not experience a marked restriction of activities of daily living.  R. at 14.  Prange indicated that he independently cared for his personal needs, that he prepared some of his own meals, that his household chores had not changed from prior to his hospitalization, and that he shopped for his medication and cigarettes.  *Id.*  This is supported by evidence in the record.  R. at 305, 319, 439-41.  Although this finding was based on information that Prange gave before he began complaining of anxiety following his defibrillator malfunction, Prange has offered no evidence that his activity level changed because of his anxiety.

The ALJ also noted that Prange did not experience marked difficulties in maintaining social functioning.  R. at 15.  Prange indicated that there was no change in his social functioning.  R. at 443-44.  The ALJ also found that Prange did not have any difficulty maintaining concentration.  R. at 15.  This is supported by evidence in the record.  R. at 442-43.  Additionally, Prange did not testify

18

that this ability changed at all following his defibrillator malfunction.  R. at 812-14.  The ALJ also found that "there is no evidence that the [Prange's] anxiety has resulted in repeated episodes of decompensation of extended duration or that his anxiety results in a complete inability to function independently outside the area of his home."  R. at 15.

The ALJ's determination that Prange's anxiety did not meet or equal Listing 12.06 is supported by substantial evidence.  The evidence set forth above is not contradicted.  Additionally, the psychologists who reviewed Prange's record for the Commissioner found that Prange had no severe mental impairment.  R. at 498-511.  Prange does not cite any evidence to the contrary.  Nor does Prange cite any evidence that his anxiety in combination with his heart condition equal a Listing condition.  On the other hand, the ME testified that Prange's condition is only slightly worse with the anxiety than it would be without it.  R. at 795-97.  The ALJ stated that he agreed with the ME's assessment that Prange's anxiety was not a severe impairment or that it would restrict Prange's ability to work.  R. at 15.

The Court concludes that the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Perales,* 402 U.S. at  401(quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).  Therefore, the ALJ's decision is supported by substantial evidence.

### E.  THE ALJ'S FAILURE TO POSE HYPOTHETICAL QUESTIONS TO THE VE

Prange alleges that the ALJ erred in determining that Prange could perform his past relevant work without asking the VE hypothetical questions that include language indicating that Prange had a 50% weakened heart capability and/or anxiety.  Prange alleges that the ALJ required the VE to

assume Prange's "functional capacity is very good," but that this was an error because it was based on the ME's disputed assessment of Prange's functional capacity.

It is not clear which question or questions Prange is referring to.  The ALJ did not ask the VE any questions about whether Prange would be capable of performing his past relevant work.  The ALJ only asked the VE how Prange's past work was classified in terms of exertional capacity and skill level, and whether Prange's past circuit board assembly work required work at dangerous heights or in close proximity to dangerous machinery.  R. at 767, 797-99, 819-20, 844-46.

In any event, the ALJ was not required to ask the VE hypothetical questions about Prange's functional capacity to determine whether he could perform his past work.  *See* 20 C.F.R. § 404.1560(b)(2) ("a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy."). Moreover, even if the ALJ did fail to ask the VE an appropriate question about Prange's ability to perform jobs in the national economy given his impairments, it is Prange's burden to protect his own interests by properly cross-examining the VE about his opinions.  *See Ragsdale v. Shalala*, 53 F.3d 816, 817-19 (7th Cir. 1995) (discussing the standards for hypothetical questions posed to VEs during Social Security Administration hearings as set forth in *Ehrhart v. Secretary*, 969 F.2d 534 (7th Cir. 1992)).  Prange elicited no testimony from which the Court can conclude that the ALJ erred in his treatment of the VE's testimony.

Specifically, Prange's counsel cross-examined the VE on several occasions during the two hearings.  R. at 765-66, 799-801, 846-47, 849-50.  At no time did Prange's attorney raise any issue

20

with the ALJ's hypothetical regarding Prange's functional capacity.  At the first hearing, Prange's

attorney cross-examined the VE about the VE's assessment of the skill level of Prange's previous

relevant work.  R. at 846-47.  The only questions that Prange's attorney asked regarding Prange's

functional capacity assumed that Prange was able to perform light work.  *Id.*  The VE was asked, "If

he can do light work under the grids but can't do his former work because of dangerous conditions,

given his age and education and work experience, do you know under the grids whether  [] he's

disabled or not?"  *Id.*  The ALJ did not allow the VE to answer that question because it would

require a legal conclusion.  *Id.*  Prange's attorney did not ask the VE any more questions.  R. at 802.

The Court can perceive no error in the ALJ's treatment of the VE's testimony.


## IV.  CONCLUSION

For the reasons stated herein, the final decision of the Commissioner of Social Security in

this case is **AFFIRMED**.  Final judgment shall be entered accordingly.

IT IS SO ORDERED this 13th day of February, 2008.


LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


Electronically distributed to:

Thomas E. Williams                         Thomas E. Kieper
teqw@aol.com                               UNITED STATES ATTORNEY'S OFFICE
                                           tom.kieper@usdoj.gov